UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
CENTRAL DIVISION
LEXINGTON

CIVIL ACTION NO. 5:19-CV-00397-KKC-EBA

ABDOURAHMAN JABBI,                                                                                       PLAINTIFF,

V.                           **REPORT AND RECOMMENDATION**

WOODFORD COUNTY, KENTUCKY;
WOODFORD COUNTY JAILER
MICHELLE RANKIN; and
SOUTHERN HEALTH PARTNERS, INC.,                                                           DEFENDANTS.

*** *** *** ***

Plaintiff Abdourahman Jabbi filed a civil complaint pursuant to 42 U.S.C. § 1983 alleging that Defendants Woodford County, Kentucky; Woodford County Jailer, Michelle Rankin; and Southern Health Partners, Inc. denied him timely access to eye care and prescription medication for glaucoma, resulting in permanently worsened vision and pain in his left eye. [R. 1 at pg. 5]. Currently before this Court are Defendants motions for summary judgment. [R. 92 & 93], and Plaintiff's motion for final judgment (construed by this Court to be a motion for summary judgment). [R. 94]. Further, Defendants filed responses to Jabbi's motion for final judgment. [R. 97 & 98]. However, Jabbi failed to file any response to Defendant's motions for summary judgement within the time period allotted in Local Rule 7.1(c). Thus, the matter being fully briefed, and following a review of the record, the Court **RECOMMENDS** that summary judgment be **GRANTED** for the Defendants and **DENIED** to the Plaintiff.

I. Facts and Procedural History

Jabbi was arrested and booked into the Woodford Country Detention Center ("WCDC") on May 23, 2018, for federal charges of possession of cocaine with intent to distribute. [R. 92-1].

Once booked, Jabbi stated that he took prescription eyedrops in response to standard medical questioning. [R. 92-3]. On May 24, 2018 a nurse with WCDC's medical provider, Southern Health Partners Inc. ("SHP"), completed a receiving screen form. [R. 92-4]. The nurse noted that Jabbi had been diagnosed with glaucoma and listed Brimonidine and Latanoprost eyedrops as Jabbi's current medication. [*Id.*]. On June 17, 2018 Jabbi submitted a request to WCDC staff stating that he had severe glaucoma and needed to see an eye doctor to check his eye pressure. [R. 92-5]. Major Gary Dawkins responded to this request indicating to Jabbi that he would need to submit a sick slip and that the United States Marshals Service ("USMS") would need to approve any medical appointments. [*Id.*].

Pursuant to Major Dawkins' instructions, Jabbi submitted a sick call slip to SHP noting that he suffers from severe glaucoma, that he had been prescribed frequent eye exams by a doctor in Georgia, that he was now behind on those visits due to his incarceration, and that he was experiencing severe eye pain. [R. 92-6]. The following day, Jabbi inquired of jail staff regarding the status of the June 21, 2018 sick call slip. [R. 92-7]. Jabbi was advised that his sick slip had been given to a SHP nurse. [*Id.*].

On June 26, 2018, SHP submitted a request to the USMS seeking for Jabbi to receive an eye doctor appointment to evaluate his glaucoma.[1] [R 92-9]. The request was approved, and an appointment was scheduled with Dr. Maria Kirkpatrick. [R 92-10]. On July 3, 2018, after SHP had scheduled his eye doctor appointment, Jabbi submitted another inmate request regarding his June 21, 2018 sick call slip stating that he was starting to feel discomfort in his eyes despite compliance with his medication and that he wished to see a doctor. [R. 92-11]. On July 5, 2018, Captain Kim Settles informed Jabbi that his request was being taken care of. [*Id.*].

---

[1] Pursuant to an Inter-Governmental Agreement with the USMS, WCDC is required to obtain prior approval from the USMS to remove a federal prisoner for non-emergent medical treatment. [R. 92-9].

On July 7, 2018, Jabbi requested a refill of his eyedrops. Jabbi was advised that he needed to fill out a sick call slip for his request to be processed. [R 92-12]. Subsequently, Jabbi submitted a sick call slip requesting a refill; accordingly, eye drops were ordered two days later. [R. 92-13].

On July 10, 2018, Jabbi was examined by Dr. Kirkpatrick. [R. 92-17]. At the examination, Jabbi reported that he was experiencing constant mild pain despite his regular use of Brimonidine and Latanoprost. [*Id.*]. Dr. Kirkpatrick ordered Jabbi to continue both drops in his left eye and instructed him to return for a follow-up in one year. [*Id.*].

In Jabbi's complaint, he asserts that around the end of August and early September 2018, he noticed new symptoms impacting his eyes, particularly the left, consisting of severe pain and periodic blackouts. [R. 1 at pg. 3]. However, Jabbi did not submit any sick call clips or inmate requests until the end of October. [R. 92 at pg 4]. On October 29, 2018, Jabbi submitted a sick call slip stating he needed monthly eye pressure checks due to severe glaucoma and that he had been experiencing pain in discomfort in his eye. [R. 92-22]. SHP officials ordered a follow-up eye examine scheduled for January 24, 2019. [R. 92-23].

On January 24, 2019, Dr. Kirkpatrick saw Jabbi again. Dr. Kirkpatrick recommended a referral to a glaucoma specialist and expressed concern that "[Jabbi] has lost significant vision in his left eye and the glaucoma appears to be advancing despite being on 2 bottles of drops already, with the patient being compliant." [R. 92-28]. Dr. Kirkpatrick ordered for Jabbi to continue Latanoprost for his left eye and changed the second eye drop from Brimonidine to Combigan. [*Id.*]. Subsequent to Jabbi's appointment, Dr. Kirkpatrick sent a letter to SHP Nurse Angie Duncan reporting her findings and stressing the importance of Jabbi seeing a glaucoma specialist as soon as possible. [R. 92-30].

Jabbi submitted a sick call slip on January 27, 2019, stating that he was having difficulty seeing with his left eye was experiencing severe headaches on the left side of his head and complaining of severe vision changes in his left eye. [R. 92-33]. Jabbi filled out another sick call slip on February 4, 2019 complaining of worsening headaches and vision loss. [R. 92-35]. Further, Jabbi stated that it had been four months since he had seen a doctor and that he needed his medical records. [*Id*.]. On February 5, 2019 Jabbi was seen by Stacy Jensen, APRN, who planned to have Jabbi seen by a glaucoma specialist at the University of Kentucky. [R. 92-10]. Jensen continued his eyedrops, and prescribed Tylenol for his pain. [*Id*.].

On February 8, 2019 Jabbi submitted a grievance complaining that he had turned in sick call slips for almost a week reporting worsening left vision in his left eye and constant headaches and asking for pain relief medication. [R. 92-36]. WCDC staff responded that he would be given pain medication that evening. [*Id*.]. Jabbi filed another grievance complaining of worsening vision in his left eye, asking to see a medical specialist, and asking for pain medication for his headache. [R. 92-37]. On February 27, 2019, Jabbi submitted a sick call slip asking for a refill of his Combigan stating that he had gone "almost a week plus to get a refill." [R. 92-37].

On February 28, 2019, Jabbi was seen by Dr. Joshua Evans. [R. 92-39]. Dr. Evans confirmed the glaucoma and Jabbi's worsening vision. [*Id*.]. He also continued Jabbi on Brimonidine and discontinued Latanoprost and instructed Jabbi to schedule a follow-up in a month. [*Id*.]. On March 2, 2019 Jabbi asked for a refill of his Combigan and Brimonidine. [R. 92-40]. SHP called Dr. Evans' office and verified that Dr. Evans had only prescribed Jabbi Brimonidine. [R. 92-41]. SHP then informed Jabbi that they could only give him Brimonidine per his Doctor's orders. [*Id*.]. On March 28, Jabbi submitted a request for a refill of his Latanoprost.

[R. 92-43]. However, SHP responded that they could not refill his Latanoprost as he was no longer prescribed it. [*Id*.].

Jabbi was confused by the Doctors' orders and asked to review Dr. Evans' order discontinuing Latanoprost – noting that he had been told differently by Dr. Kirkpatrick. [R. 92-45]. The next day SHP staff reiterated that Dr. Evans' office had instructed SHP to only administer Brimonidine. [R. 92-46]. Jabbi had a follow-up with Dr. Evans on April 11, 2019 at which time Dr. Evans recommended that Jabbi receive an MRI due to worsening vision and headaches. [R. 92-48.]. Subsequently, Jabbi made various requests for pain medication and refills for his Brimonidine, all of which were handled promptly. [R. 92-48, 49, & 51]. Jabbi received an MRI on May 2, 2019 which showed no acute abnormalities. [R. 92-51].

Jabbi filed his *pro se* Complaint on September 26, 2019 alleging that he did not receive proper medical care for his glaucoma during his time at WCDC. [R. 1. at pg. 8]. This matter was referred to the undersigned on June 23, 2020. [R. 34]. Defendants and Plaintiff have filed cross motions for summary judgment in the instant action. [R. 92, 93, & 94].

## II. STANDARD OF REVIEW

Under Rule 56, "[a] party may move for summary judgment, identifying each claim or defense — or the part of each claim or defense — on which summary judgment is sought." Fed. R. Civ. P. 56(a). "[A] party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Such a motion then "requires the nonmoving party to go beyond the pleadings and by [his] own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial." *Id*. at 324 (internal quotation marks omitted). This is so because "[o]ne of the principal purposes of the summary judgment rule

is to isolate and dispose of factually unsupported claims or defenses." *Id.* at 323–24. To avoid summary judgment, the non-movant must come forward with evidence on which a jury could reasonably find in its favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986). The following factors bear consideration by a court when entertaining a motion for summary judgment:

    1. Complex cases are not necessarily inappropriate for summary judgment.

    2. Cases involving state of mind issues are not necessarily inappropriate for summary judgment.

    3. The movant must meet the initial burden of showing "the absence of a genuine issue of material fact" as to an essential element of the non-movant's case.

    4. This burden may be met by pointing out to the court that the respondent, having had sufficient opportunity for discovery, has no evidence to support an essential element of his or her case.

    5. A court should apply a federal directed verdict standard in ruling on a motion for summary judgment. The inquiry on a summary judgment motion or a directed verdict motion is the same: whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.

    6. As on federal directed verdict motions, the "scintilla rule" applies, *i.e.,* the respondent must adduce more than a scintilla of evidence to overcome the motion.

    7. The substantive law governing the case will determine what issues of fact are material, and any heightened burden of proof required by the substantive law for an element of the respondent's case, such as proof by clear and convincing evidence, must be satisfied by the respondent.

    8. The respondent cannot rely on the hope that the trier of fact will disbelieve the movant's denial of a disputed fact, but must "present affirmative evidence in order to defeat a properly supported motion for summary judgment."

    9. The trial court no longer has the duty to search the entire record to establish that it is bereft of a genuine issue of material fact.

    10. The trial court has more discretion than in the "old era" in evaluating the respondent's evidence. The respondent must "do more than simply show that there is some metaphysical doubt as to the material facts." Further, "[w]here the record

> taken as a whole could not lead a rational trier of fact to find" for the respondent, the motion should be granted. The trial court has at least some discretion to determine whether the respondent's claim is "implausible."

*Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1479-80 (6th Cir. 1989).

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Celotex*, 477 U.S. at 324. When reviewing a motion for summary judgment, "this Court must determine whether 'the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.'" *Patton v. Bearden*, 8 F.3d 343, 346 (6th Cir. 1993) (quoting *Anderson*, 477 U.S. at 251-52). "[T]he existence of a mere scintilla of evidence in support of the non-moving party's position will not be sufficient; there must be evidence on which the jury could reasonably find for the non-moving party." *Sutherland v. Mich. Dept. of Treasury*, 344 F.3d 603, 613 (6th Cir. 2003) (citing *Anderson*, 477 U.S. at 251). The evidence, all facts, and any inferences that may permissibly be drawn from the facts must be viewed in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). "Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial." *Id.* (citing *First Nat'l Bank of Ariz. v. Cities Serv. Co.*, 391 U.S.253, 288 (1968)). In such a case, summary judgment is warranted. *Alabama v. North Carolina*, 560 U.S. 330, 344 (2010); *Celotex,* 477 U.S. at 322; *Anderson*, 477 U.S. at 248.

### III. ANALYSIS

Defendants argue that they are entitled to relief in the form of summary judgment due to Jabbi's inability to successfully plead the merits of his § 1983 complaint. This Court agrees.

Jabbi's § 1983 complaint alleges that Defendants violated his constitutional rights by failing to provide him adequate medical care while he was incarcerated. Construed broadly, Jabbi raises two issues interspersed throughout his complaint and motion for final judgment. First, Jabbi alleges that he was denied medication for a significant period of time throughout his incarceration resulting in loss of vision and pain. Second, Jabbi alleges that prison officials delayed in scheduling him an appointment with an eye doctor contributing to his loss of vision in his left eye. Integral to the success of the parties' respective motions is whether Jabbi has provided sufficient facts to allege that the prison officials providing him medical care were "deliberately indifferent" to his serious needs. *Estelle v. Gamble*, 429 U.S. 97, 104, 97 S. Ct. 285, 50 L. Ed. 2d 251 (1976); *Farmer v. Brennan*, 511 U.S. 825, 835, 114 S. Ct. 1970, 128 L. Ed. 2d 811 (1994). Thus, the Court turns to whether Jabbi has met his burden under the Eighth Amendment's deliberate indifference standard.

"The Eighth Amendment protects prisoners against the imposition of 'cruel and unusual punishment.'" *Parrish v Johnson*, 800 F. 2d 600, 604 (6th Cir. 1986) (citing U.S. Const. amend. VIII)). The government has an "obligation to provide medical care for those whom it is punishing by incarceration." *Estelle*, 429 at 103. For this reason, "[t]he treatment a prisoner receives in prison and the conditions under which he is confined are subject to strict scrutiny." *Helling v. McKinnery*, 509 U.S. 25, 31 113 S. Ct. 2475, 125 L. Ed. 2d 22 (1993). Notwithstanding, not "every claim by a prisoner that he has not received adequate medical treatment states a violation of the Eighth Amendment." *Estelle*, 429 U.S. at 103. The "deliberate indifference to serious medical needs of prisoners constitutes the 'unnecessary and wanton infliction of pain' . . . [as] proscribed by the Eighth Amendment." *Id*. at 104 (quoting *Gregg v. Georgia*, 428 U.S. 153, 173, 96 S. Ct. 2909, 49 L. Ed. 2d 859 (1976)). "This is true whether the indifference is manifested by prison doctors in

their response to the prisoner's needs or by prison guards in intentionally denying or delaying access to medical care or intentionally interfering with the treatment once prescribed." *Id*. "A prison official is deliberately indifferent when he acts with criminal recklessness, a state of mind that requires that he act with a conscious disregard to a substantial risk of serious harm to the prisoner." *Love v. Taft*, 30 F. App'x 336, 337 (6th Cir. 2002) (citing *Farmer v. Brennan*, 511 U.S. 825, 837, 114 S. Ct. 1970, 128 L. Ed. 2d 811 (1994)). Thus, "[t]he test involves both an objective and subjective component." *Brown v. Bargery*, 207 F.3d. 863, 867 (6th Cir. 2000); *see also Farmer* at 843; *Napier v. Madison County Ky.*, 238 F.3d 739, 742 (6th Cir. 2001)

The *Estelle* Court, addressing a § 1983 claim filed by a state prisoner, outlines the traditional deliberate indifference standard for establishing inadequate medical care under the Eighth Amendment:

> In the medical context, an inadvertent failure to provide adequate medical care cannot be said to constitute "an unnecessary and wanton infliction of pain" or to be "repugnant to the conscience of mankind." Thus, a complaint that a physician has been negligent in diagnosing or treating a medical condition does not state a valid claim of medical mistreatment under the Eighth Amendment. Medical malpractice does not become a constitutional violation merely because the victim is a prisoner. In order to state a cognizable claim, a prisoner must allege acts or omissions sufficiently harmful to evidence deliberate indifference to serious medical needs. It is only such indifference that can offend "evolving standards of decency" in violation of the Eighth Amendment.

*Estelle* at 105–06.

### A. Deliberate indifference in medical care.

In this case, Jabbi has not set forth any set of facts, nor provided any evidence in support of his claims that would entitle him to relief. Jabbi's allegations largely stem from his assertion that Defendants denied him medication for his glaucoma over a five-month time period between August and December of 2018. In his motion for final judgment, Jabbi alleges that:

> Defendants . . . acted in bad faith and deni[ed] plaintiff necessary treatment to treat his glaucoma condition during [the time] he was detained at [WCDC], in particular during the period . . . from August 2018 through December 2018. During this time plaintiff suffered [a] severe lack of medication needed to maintain[] and control his glaucoma.

[R. 94 at pg. 1]. Notably, the parties differ in their interpretations of the events surrounding Jabbi's medical needs, as the Defendants dispute Jabbi's assertions that he was not given medication during his incarceration. At the summary judgment stage, "the evidence is construed and all reasonable inferences are drawn in favor of the nonmoving party." *Burgess v. Fischer*, 735 F.3d. 462, 471 (6th Cir. 2013) (citing *Hawkins v. Anheuser-Busch, Inc.*, 517 F.3d 321, 332 (6th Cir. 2008)). But, "[w]hen opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Scott v. Harris*, 550 U.S. 372, 380, 127 S. Ct. 1769, 167 L. Ed. 2d 686 (2007).

It is undisputed that Jabbi came to WCDC with his current glaucoma medications in hand. [R. 92-1]. A SHP nurse then entered an order continuing Jabbi's glaucoma medication until he could be seen by an outside provider. [R. 92-4]. Subsequently, Jabbi was seen by Dr. Kirkpatrick on July 10, 2018. [R.92-28]. There, Dr. Kirkpatrick wrote a prescription with refills continuing Jabbi on his medication (Latanoprost and Brimonidine). [*Id*.]. A day later, A SHP nurse called in an order for Jabbi's eyedrops. [R. 92-15]. Notably, Jabbi's MAR ("Medical Administrative Record") noted the "KOP" status of his medication, meaning that he was allowed to keep his medications on his person and administer them as necessary. [R.92-15]. Jabbi relies on a lack of change to his MAR records subsequent to his appointment with Dr. Kirkpatrick as proof that he was denied medication. [R. 94 at pg. 2 "Exhibit C"]. However, Defendants contend that a new MAR was not necessary for the period of July 2018 through January 2019, as Dr. Kirkpatrick did

not change Jabbi's prescription. [R. 97 at pg. 3]. Jabbi submitted a sick call slip on December 11, 2018 indicating that he had discomfort in his left eye. [R. 92-27]. In response, prison officials scheduled a follow-up appointment with Dr. Kirkpatrick, who then changed his medications discontinuing Brimonidine and ordering Latanoprost and Combigan. [R.92-28]. Notably, in Dr. Kirkpatrick's referral to Dr. Evans, Dr. Kirkpatrick noted that "the patient has lost significant vision in his left eye and the glaucoma appears to be advancing despite being on 2 bottles of drops already, with [Jabbi] being compliant [with his medications.]" [*Id.*]. Jabbi submitted medical call slips on February 27, 2019 and March 2, 2019 indicating that he was out of eyedrops. [R. 92-37, R. 92-40]. However, the requests seem to be based on Jabbi's misunderstanding of what his doctors had ordered. Jabbi was requesting refills of Latanoprost and Combigan as Dr. Kirkpatrick has ordered at their second appointment. [R. 92-28]. However, Dr. Evans changed Jabbi's prescription to just Brimonidine. [R. 92-39]. Accordingly, prison officials denied Jabbi these eyedrops, as they were not his prescription. [R. 92-41].

Taken together, Defendants' explanation of the "KOP" MAR, Dr. Kirkpatrick indicating that Jabbi was compliant with his medication, and Defendants' evidence regarding Jabbi's misunderstanding of his prescription blatantly contradict Jabbi's assertion that he was not provided medication. The record clearly indicates that Jabbi was in possession of his medication during the alleged period of depravation and Dr. Kirkpatrick's notes indicate that Jabbi was compliant with his eyedrops. Further, Jabbi's claims regarding lack of medication subsequent to his eye appointments seem to be based on a misunderstanding of what medications were actually prescribed to him at what time. Thus, logic dictates that Jabbi was in possession of his medication during the alleged time period. Accordingly, Jabbi has not set forth any set of facts, nor provided any evidence, in support of his claims that would entitle him to relief.

**B. Deliberate indifference in scheduling of doctor visits.**

In Jabbi's motion for final judgement, he alleges that, along with the lack of necessary medication, the lack of "routine doctor's treatment" was a causal factor in the worsening to his eye. [R. 94 at pg. 2]. However, Jabbi has not put forward any evidence which would indicate this to be true. In the Sixth Circuit, the underlying principle that neither negligent medical care nor delay in medical care constitutes a constitutional violation has been consistently underscored. *See e.g.*, *Acord v. Brown*, No. 93-2083, 1994 U.S. App. LEXIS 34320, 1994 WL 679365, at *2 (6th Cir. Dec. 5, 1994) ("Accidents, mistakes, negligence and medical malpractice are not constitutional violations merely because the victim is a prisoner. Neither negligent medical care nor delay in medical care constitutes a violation of the Eighth Amendment unless there has been deliberate indifference which results in substantial harm.") (citations omitted). Further, "[a]n inmate who complains that delay in medical treatment rose to a constitutional violation must place verifying medical evidence in the record to establish the detrimental effect of the delay in medical treatment." *Napier v. Madison County., Ky.*, 238 F.3d 739, 742 (6th Cir. 2001) (internal quotation omitted); *see also Canady v. Wilkinson*, 90 F. App'x 863, 865 (6th Cir. 2004) (applying verifying medical evidence requirement to a prisoner's claims based on an alleged delay in glaucoma treatment); *Rumsey v. Martin*, 28 F. App'x 500, 502 (6th Cir. 2002) (holding prisoner could not prevail on deliberate indifference claim regarding delay in refilling prescriptions absent "medical evidence which clearly shows that his condition deteriorated because of a delay in filling his prescriptions"). Jabbi fails to submit any evidence corroborating his claim that any delay in the scheduling of his eye doctor appointments caused his glaucoma to progress. Thus, Jabbi fails on this claim.

It is well established that a moving party may be "'entitled to a judgment as a matter of law' because the nonmoving party has failed to make a sufficient showing on an essential element of her case with respect to which she has the burden of proof." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986) (quoting Fed. R. Civ. P. 56). A Plaintiff "must produce sufficient evidence from which the jury may reasonably reject [defendants'] explanation." *Manzer v. Diamond Shamrock Chemicals Co.*, 29 F.3d 1078, 1083 (6th Cir. 1994). Jabbi has not done so. Jabbi has failed to establish that any such "deliberate indifference" occurred during his incarceration. In this case, such an unfounded claim is not sufficient to overcome the standard of review for summary judgment. *Sutherland v. Mich. Dept. of Treasury*, 344 F.3d 603, 613 (6th Cir. 2003). Accordingly, Jabbi's § 1983 claim against the Defendants for deliberate indifference is insufficient for relief and Defendants should be entitled to summary judgment as a matter of law. *Miller v. Freedom Waffles, Inc.*, 2007 U.S. Dist. LEXIS 13217, 2007 WL 628123, *5 (W.D. Ky. 2007) (Heyburn, J.).

### C. Conclusion

In essence, Jabbi has argued that Defendants violated his Eighth Amendment rights by delaying the proper medication and treatment of his glaucoma causing his glaucoma to worsen. For an Eighth Amendment claim based on an alleged delay in providing medication, the prisoner must place verifying medical evidence in the record establishing the detrimental effect of the delay. *Napier v. Madison County, Ky.,* 238 F.3d 739, 742 (6th Cir. 2001). Jabbi has not met this requirement. Jabbi has failed to prove that the prison officials delay in providing medication to him constitutes deliberate indifference. Because the undersigned finds Jabbi's claim without merit, an analysis of the Defendants' alternative defenses regarding qualified immunity and *Monell* are not warranted.

### IV. RECOMMENDATION

In sum, Defendants should be entitled to summary judgment as he cannot meet neither objective and subjective prongs of his 42 U.S.C. § 1983 deliberate indifference claim, nor can he allege that an official policy or custom of the Defendants caused a depravation in his constitutional rights. Thus, **IT IS RECOMMENDED** that:

1. Woodford County's motion for summary judgment [R. 92] be **GRANTED**.

2. Southern Health Partners, motion for summary judgment [R. 93] be **GRANTED**.

3. Jabbi's Motion for Final Judgment [R. 94] be **DENIED**.

*** *** *** ***

The parties are directed to 28 U.S.C. § 636(b)(1) for a review of appeal rights governing this Recommended Disposition. Particularized objections to this Recommended Disposition must be filed with the Clerk of the Court within fourteen days of the date of service or further appeal is waived. Fed. R. Civ. P. 72(b)(2); *United States v. Sullivan*, 431 F.3d 976, 984 (6th Cir. 2005). A general objection that does not "specify the issues of contention" is not enough to satisfy the requirement of written and specific objections. *Miller v. Currie*, 50 F.3d 373, 380 (6th Cir. 1995). Poorly drafted objections, general objections, or objections that require a judge's interpretation should be afforded no effect and are not enough to preserve the right of appeal. *Howard v. Secretary of HHS*, 932 F.2d 505, 508-09 (6th Cir. 1991). A party may respond to another party's objections within fourteen days of being served with a copy of those objections. Fed. R. Civ. P. 72(b)(2).

Signed November 16, 2021.



Signed By:

*Edward B. Atkins*  ℰℬA

United States Magistrate Judge